Good morning, Your Honors. My name is Katherine Mize, and I represent John Nelson. We're the appellants in this matter. And I'd like to focus my comments today on the three key errors made by the District Court in dismissing this case on the pleadings alone, on the complaint. The first error made by the District Court was its factual determination that the wires used to effect the wire fraud that is one of the predicate acts under Mr. Nelson's RICO claim. The District Court erroneously and factually concluded that those wires were intrastate only. Well, does that make any difference if there aren't any sufficient predicate acts? Well, it makes a difference because wire fraud is one of the six predicate acts alleged in this case, and the District Court's decision was based on eliminating all six predicate acts. Well, yeah, but you've got to have continuity for any of them, as long as you – okay, right? Yes. So if there isn't, then it doesn't really make any difference whether the District Court was right or wrong on any of the six, does it? Well, let me focus then on the continuity issue. I think that relates to whether, in fact, there is a pattern of racketeering activity. Yes. And the case that most heavily has addressed this is the United States Supreme Court case of H.J. v. Northwestern Bell.  And the Court at length discussed how it looks at whether or not there is a pattern. And it was determined that you look at continuity plus a threat of repetition. And the points made by MGM and below is an isolated quote from that H.J. case regarding the legislative history of RICO where one gentleman stated, as part of the argument for the law, that two acts by themselves is not enough. That is only part of what the H.J. case discusses. And, in fact, there is specific discussion in the H.J. opinion about the fact that if the types of activities that are taking place are part of the daily operations of the business, which is exactly the case here in MGM's business, then there is the threat of repetition. And the reason that's the case is because it's not an isolated incident. It is not the type of thing that can occur only once. It's the type of thing that can occur every single time a patron, such as Mr. Nelson, gets up in his winnings and wants to wire transfer his winnings away from MGM and thereby keep his winnings out of the pockets of MGM. And that's not what happened in this case. Because this is at the pleading stage, we were unable to do any discovery about how many other times this happens with other patrons. But certainly with respect to Mr. Nelson, for it to have happened on two separate with two separate wire transfers, and for the money to have been made available at the time that he was leaving, and I think it's very important to note that the money was made available not by check, not by cashier's check, not by any form or even by affecting the wire transfers that had been placed days before. Instead, the money was simply restored to his account, and the MGM informant told Mr. Nelson that it was available for play. That was done expressly in violation of the prior written representations that the wire transfers had been made, and also done in a way that the ten years of history that the MGM has based on its player tracking system made them know that if cash is available, Mr. Nelson, as a regular gambler, will use that money, converting a $235,000 loss to the MGM back into a gain into its accounts. So that's why I believe that the pattern is very clear in this case because it was two separate occasions, two separate wire transfers. Kagan. Oh, within, within, within, like? It was within a matter of days. But, again, the focus is on the threat of repetition. Well, yes, but he's been, according to the complaint, has been a significant participant at MGM for a very long time. Absolutely. And evidently this is the only time it's happened. So it's a little bit difficult to stretch it to say that there is a threat of continuing activity. Well, I think there is, and let me point out one reason. Mr. Nelson, as somebody who likes to gamble, understands that losing is far more likely than winning. And you can take the ten years of his gambling history as his own recognition that he's lost many times and never complained about it. He's lost millions of dollars by his own admission. It's not the choice probably any of us would make, but that's his choice and entitled to do it. The fact that he has not complained about any of those losses is why this case is here. It's not about losing the money. It's about the means that was used by the MGM to do so. And it's the means of not effecting those wire transfers. In spite of written and verbal representations to the contrary, and most importantly, the representation in the, I'll call it the bank account that Mr. Nelson maintains at the casino, when he looked at that account every time he's at a table getting ready to make a wager, it showed that those wire transfers had been made. That meant that every single wager that he made from the time he thought that the wire transfers had gone through was made based on the assumption that he had $235,000 safe and sound away from his reach in his And that was false, and those were continued false representations by MGM. And because it's hard to conceive that a regular practice of making a wire transfer, which is not a hard transfer to do, would have been not occurred on two separate occasions, and that it would have only been discovered at the time that MGM knew that Mr. Nelson was about to leave and then they would not be able to regain that money. That's the threat of repetition, and the fact that wire transfers occur every day in the business of MGM. It is a financial institution under Federal law, and it is subject to those high standards applicable to banks. So certainly from the pattern standpoint, we believe that's important. With respect to the predicate acts, one issue, of course, is whether the wires were intrastate. There is nothing in the pleadings to suggest that they were intrastate. I have an impossible time imagining how they could only be intrastate when the account reflected that the money had been transferred, was out of his account. MGM is a national entity. Whether Mr. Nelson is in Las Vegas or he's in Mississippi at the Beau Ravage, all of the accounting information for MGM is nationally networked. Those are interstate wires, and clearly MGM is engaged in interstate commerce. I don't think there's any doubt about that. With respect to the predicate acts involving the Nevada gaming statutes, there were various reasons that the Court asserted, the most erroneous of which was the idea that game under the Nevada statutes does not include the payment of money won in a game. First of all, that is absolutely contrary to the definition of game found in 463.0152, which is the definition of game. It defines a game, a gambling game, as something that involves the payment of money. People don't come to Las Vegas just to play and not get their money. The effect of what the MGM did through its course of behavior in this case is Mr. Nelson won at gambling games over several days and never got the money until many days later. That is a violation of the criminal statutes that are part of the predicate acts underlying Mr. Nelson's RICO claim. And I'd like to reserve the rest of my time. Thank you. May it please the Court, Todd Bice on behalf of the appellees MGM. The question presented to this Court this morning is whether a Federal RICO claim is at issue by a one-time dispute between a Nevada gaming licensee and one of its patrons over his claimed inability to control his gambling. And that is what we have. The district court in this case, Judge Sandoval, held that it was not, and he was right for at least two reasons. The first is, and the foremost reason is, setting aside all of the allegations about what Nevada law is or isn't, or what Federal Wire, what the Federal Wire Act precludes or doesn't preclude, is that there is simply no allegations in the complaint about any pattern of racketeering activity. If you looked at their original complaint and their motions to dismiss that were before the district, or their oppositions to the motion to dismiss before the district court, Judge, there is not any discussion whatsoever about open-ended continuity or closed-end continuity, because there is none. They could provide no factual evidence. They simply said, well, it happened twice. There were two wire acts on one or two wire transfers on one day. Those are two, quote, unquote, predicate acts, according to them, and that's sufficient. Well, the law in this district, or this circuit, I apologize, has been longstanding that that is not sufficient. You actually have to be able to allege either open-ended continuity or closed-end continuity with respect to the alleged racketeering, the alleged predicate acts that you are saying. This Court has long held that a simple commercial dispute between two parties, whether it occurs over the course of months or even the course of years, does not give rise to a pattern of racketeering. And here's what we have. We have Mr. Nelson who claims he can't control his gambling, who says that he asked some money to be wired out, who then found out that it was available and asked for it back, and so it was given back to him. Now he says, well, there were two separate times I had requested wires to go out, and so therefore that is the sole extent of the dispute. That is the entire universe of the alleged wrongdoing here by MGM is that it didn't effectuate fast enough for this gentleman, his wire transfers, because once he found out that the money was still there and that the transfers hadn't been completed yet, it was available for him to gamble with and he demanded it back and he gambled it. Those events, those isolated events, those two isolated events cannot give rise to a RICO claim. If it is a RICO, if that is a pattern of racketeering activity, every commercial dispute in this circuit will be a RICO claim under that, under their theory, because you will now have, well, I gave them two checks when I bought the car, or when I had my car serviced. I had it serviced there twice. I paid them with two checks. That's two disputes. Aha, look, I now have a RICO claim. I now have a Federal RICO claim because I couldn't control my gambling, is what this gentleman's claim is. Obviously, I'm not going to belabor the case law. It has been briefed to you extensively. The district court looked at this quite correctly and recognized there is no pattern here. Ms. Dorsey, may I switch your gears to the State law claims? Yes. Obviously, the district court found, and it's your position, that the claims are all within the exclusive jurisdiction of the State Gaming Commission. Correct. Can you spell that out for me a little bit more? Because it isn't immediately obvious to me that a claim that MGM messed up in how it wired transferred, putting the merits aside, the claim that it messed up in effectuating wire transfers is a dispute about a, about loss or winnings or a game. Sure. Or how a game is conducted. First, let me start off by noting that I was, there is some benefit here to the fact that the district court judge just coincidentally has a lot of working experience with these statutes and regulations. Prior to becoming a U.S. district court judge, he was the Attorney General. I have no doubt about that. And then he was. It still is not immediately obvious to me. Sure. So that's why I'm looking to you to explain it. The way that the statute works and the way that it is structured is, is that obviously at common law, there is no claim over gambling, winnings, losses, or any claim that arises out of gambling. The courts say, and the Nevada Supreme Court has long held this, is that the parties are left. Well, here's my point. Yes. It's not, it's not crystal clear that this claim has to do with gambling. Well. It has to do with MGM's screwing up a wire transfer, which Bank of America could do just as easily as MGM could do, and it would have nothing to do with gambling. I disagree with that, and here's why I disagree with that. He got the money back. What does his claim stem from? His claim stems from he lost the money gambling. Yes. He doesn't have a claim from any injury from the alleged failure to transfer the wire. No, he doesn't. That's not his claim. His claim is they messed up the wire transfer, and that therefore allowed me to have that money in my pocket in Las Vegas instead of in my pocket in Houston. Right. And I therefore, I lost it whether it was from gambling or whether it was from getting stolen in the parking lot on the way out of the MGM or whatever. I mean, he may have no claim whatsoever, okay, on the merits. I doubt he does. But I'm trying to focus on why a core claim of fraud or breach of fiduciary duty or whatever in managing that money necessarily is within the jurisdiction of the Gaming Commission. Because he did lose it gambling. This isn't a case where he lost it doing something else. He did lose it at gambling. Let's take the hypothetical you said, that it could have been Bank of America that had failed to properly execute the wire transfer. All right. Bank of America then gives you the money back, and you've got the money. Now, what you do with it is your business. Well, that's precisely the point. But you don't have an injury. That's precisely the point. But there's no injury from the failure to execute the wire transfer. But you have just exactly made my point rather clear, and that is that it's at that point, it's your choice. And it could have gotten stolen or it could have gotten spent on a fur coat, although probably not in Las Vegas. Right. There's lots of ways it could have been wasted or lost. Right. Why is how it's wasted or lost even relevant to determining whether a claim is made out in the first place? Because Nevada law specifies that any dispute involving gambling that involves winnings, losses, the method of conducting any game, et cetera, there is no claim in a court of law. It is only in front of the board. So that's why it matters that he lost the money gambling, because his injury, where he claims he lost the money, is gambling. He had no injury until, according to him, until he gambled it away. But if he had walked out of the building with $250,000 in his pocket and somebody mugged him and took it away, you would say that could be? I would say you have no claim. He would have? He would have no claim against MGM, what, that they gave him his own money back? But that is his claim. Okay. Well, that's not a viable cause of action, that someone gave you your money back. And the tort there would be, there would be all sorts of different tort problems with that in that it wouldn't be reasonably foreseeable, et cetera. That's a merits-based argument. And I don't have any quarrel with whether he may, you may have the same problem on the merits here. But what's the difference? And why would the one be within the gaming jurisdiction and the mugging right outside the door of the MGM be any different? Because the mugging right outside of the door of the MGM would also be subject to a motion to dismiss. It would just be different elements. In other words, foreseeability, et cetera, et cetera. But the ruling was here, was on exclusive jurisdiction in the Nevada Gaming Commission. Technically in front of the board, but correct. Or board, whatever they call it. Correct. Because he lost the money gambling. His only injury, he didn't lose it to a mugger. He lost it gambling. He made a choice to gamble. And thus the law says that if you gamble and now you want to claim that you shouldn't you should get your money back, your exclusive remedy is in front of the board. That's what the statute has provided. That is what the statute has provided since essentially gambling was legalized in the State of Nevada. If the statute didn't provide that, you would have no claim at all. Because what the law has always been is that you leave parties to a gambling contract where you find them. The courts do not intervene in gambling disputes. It has been that way in California, Nevada, everywhere in the United States since gambling was legalized in Nevada. The only mechanism for you to claim I want my money back from the casino is to go before the board through a patron dispute mechanism and seek your money back. He did not do that. Instead what he did is he complained about the method of operation. Because the board really functions in two separate capacities. I see my time is up. If you would like. The board functions in two capacities. It has an investigative capacity whereby, in other words, it investigates alleged wrongdoing. And it also has a capacity where it serves as an administrative tribunal whereby it decides disputes between the licensee and the patrons, which is the statute sets up that mechanism. And then you can ultimately appeal to the courts for judicial review of that ultimate decision. He didn't pursue that. That was his remedy. If that's what he wanted to do, he wanted to say, well, listen, I lost that money. I shouldn't have lost it. That's the mechanism. There is no court claim to be had for such a dispute. Thank you very much. Kagan. Thank you, Mr. Price. Ms. Price. Your Honors, MGM has just stated an aspirational view of what it would like the Nevada Gaming Control Board to do. And that is not what the statutes that govern the Nevada Gaming Control Board do. I think a telling statement is on the record at page 72, which is the brief of MGM, and I'll quote it. MGM's argument is that a casino patron has no cognizable claim in court for events related to gaming. Nelson's sole remedy, if any, is to seek relief before the Nevada State Gaming Control Board. That is not what the statutes say, and that's not even what the district court found in this case. Moreover, Mr. Nelson did, in fact, assert a complaint with the Nevada Gaming Control Board, and they found that it didn't relate to gaming activities. I don't have that. What exactly did he complain about to the Nevada Board? That the wire transfers were not made promptly and that he was given fraudulent indicia that they had been made and that his account was credited. It's the same claim. Exactly. And they said it's not within our purview. Where did they say that? It's attached to the Respondent's. I mean, they said it didn't go anywhere because there's no obligation on the part of MGM to make wire transfers at any particular time. And they said that's outside, that is not a gaming matter, and therefore, there is no right to appeal. It's in a letter that is attached to their response. Well, yeah, there's no right to appeal, but so that doesn't mean that they didn't resolve it. They said that it's not within our purview. But they dealt with it on the merits, didn't they? I disagree. And let me raise a second issue. I'm going to open a giant can of worms, and it relates to the investment injury rule. Because this circuit, and I know Justice Judge Fletcher wrote an opinion about this, that this is one of the few circuits that requires there be a double injury in the context of a RICO 1962A Act. It requires the injury from the Predicate Act and an injury – may I complete my – and an injury from RICO itself. This is one of the only cases I can imagine where there actually are the two injuries that are required. There is the injury from the Predicate Acts themselves and the injury from the return of the money under circumstances that MGM knew would result in Mr. Nelson returning the money to its coffers. That's the double injury, and that's precisely why this is a RICO cause of action and not something that is within – the Nevada State Gaming Control Board does not have jurisdiction over RICO claims.  GOTTLIEB Okay. Counsel, thank you for your argument. The matter just argued that it will be submitted.  MS.
judges: Fletcher, Rymer, Duffy